IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>  )<br>      Plaintiff, )<br>v. )<br>  )<br>MIGUEL MORENO )<br>  )<br>      Defendant. ) | Case No. 5:19cr2 |

### MIGUEL MORENO'S SENTENCING MEMORANDUM

When Miguel Moreno's mother died tragically in a workplace accident, he was only 13 years old, and his life took a heartbreaking turn. He floundered trying to find his place in his family, his community, and the world. It is not surprising, then, that he succumbed to the encouragement, persuasion, and direction of his older incarcerated brother to become involved in dealing drugs. But for his brother's influence, Miguel Moreno would not be appearing before this Court for sentencing.

Taking into account (1) Mr. Moreno's lack of criminal history; (2) the lesser role that he played in this offense; (3) the unwarranted disparity caused by the treatment of a methamphetamine mixture versus actual methamphetamine; (4) that drug quantity is a poor proxy for criminal culpability; and (5) Mr. Moreno's efforts to make amends for his involvement in the offense and his demonstrated amenability to supervision, it is clear that a sentence of 36 months satisfies all of the goals of sentencing and is sufficient, but not greater than necessary, to punish Mr. Moreno for his involvement in this offense.

### ARGUMENT

**A. Sentencing Authorities.**

With the watershed decision of *United States v. Booker*, 543 U.S. 220 (2005), the question of

*whether* prison is *necessary* for a particular individual returns to a place of primacy in the sentencing decision. A court must impose the *minimum* term necessary to comply with the goals of sentencing, *i.e.*, just punishment, deterrence, protection of the public and rehabilitation of the defendant, taking into consideration all factors set forth in 18 U.S.C. § 3553(a). *See* 18 U.S.C. § 3553(a)(2).

   B. **A sentence of 36 months takes into account Mr. Moreno's tragic history, vulnerability, youth, lack of criminal history, and amenability to supervison. (18 U.S.C. § 3553(a)(1))**

Miguel Moreno's mother died tragically in a workplace accident – a wall fell on her at the factory where she worked[1] – when he was only 13 years old. When interviewed for a Hispanic blog a few months later, Miguel struggled to describe the fallout from his mother's death stating, "To tell you the truth, I never stop thinking about it." He lived with his father for a short time after his mother's passing until his father became involved in a new romantic relationship and eventually moved to Texas without telling Miguel or his sisters. Within about a year after his mother's death, Mr. Moreno began living with his older sister. Daisy Moreno was only a couple of years older than Miguel – still a young teenager herself – but she was emancipated with a young child of her own, and she took her brother into her home as well.

During his freshman and sophomore years of high school, Miguel played soccer and was captain of his high school team. Unfortunately, he had begun smoking marijuana in an attempt to cope with his mother's death and, eventually, his grades suffered and he quit the soccer team. Against the odds and though he struggled to get there, Miguel successfully graduated from high school in 2014. According to the principal of his high school, William Teachey, Miguel was a student who was a "leader on the soccer team and always represented [the] school in a positive

---

[1] On April 13, 2010, Ms. Hernandez worked at a factory that made ice cream cones in Waynesboro, Virginia when a forklift struck a wall causing a part of the cinder-block wall to collapse and fall on her. She died at the scene. See https://www.nbc29.com/story/12302595/wall-collapse-in-waynesboro-1-fatality for more information.

manner." See Exhibit 1 (Letter from Mr. Teachey). In addition, Miguel was "always willing to assist other students, especially students struggling to learn the English language," and was often called upon to "assist with translating information or to communicate with another family needing assistance." *Id.* Despite, the seriousness of his offense, Miguel's former principal continues to support him.

After high school, Miguel's life-long goal was to join the Marine Corps. This dream of service to his country was derailed, though, when he was not accepted into the service due to his tattoos – he had gotten several tattoos honoring his late mother after her death. In the ensuing couple of years after his Marine Corps dream collapsed, Miguel floundered a bit trying to find his place in his family – both of his sisters now had children of their own – in his community, and in the world. Though he has limited work history due to his young age, he has consistently worked since the time he has been able to do so. One of his former employer's notes that he was "on time," a "good worker," and "responsible." See PSR, ¶ 41. Miguel has consistently worked since he has been on bond for this case.

It is in this context of trying to find his place in the world after his mother's death and his father's abandonment that Miguel became involved in the series of events that bring him before the court. He is a young man with no criminal record – aside from a few minor traffic offenses for which he received no criminal history points – who became involved in methamphetamine trafficking due to the encouragement and manipulation of his older incarcerated brother.

Miguel's brother is seven years older than him, and he began contacting Miguel in late 2017 after many years of incarceration. He first began asking Miguel for favors, such as phone cards, and eventually asked if he knew of anyone interesting in distributing methamphetamine. Though Miguel had no prior experience with methamphetamine, he agreed to become involved in the offense himself. He was directed when and where to pick up the drugs, who and how much to pay for

them, and did not have a sophisticated understanding of who was involved in the offense. Miguel was involved in the drug distribution activities for no more than six months. It is clear that but for his brother's directions and persuasion, Mr. Moreno would not have been involved in drug dealing at all.

### C. The circumstances of the offense demonstrate Mr. Moreno's short-lived involvement in the crime and highlight his lack of awareness of the full scope of the operation or of the purity of the drugs involved. (18 U.S.C. § 3553(a)(1))

As outlined in the PSR, on June 20, 2018, a law enforcement officer in New Mexico stopped a car-hauler and ultimately conducted a search that led to the discovery of almost 10 kilos of pure methamphetamine in a tire. Bafflingly, a subsequent search conducted of the same tire several days after the initial search and after the tire had been outside of law enforcement control while it was transported from New Mexico to Virginia yielded another four kilograms of only 95% pure methamphetamine. Although Mr. Moreno does not dispute that he had been informed that at least 500 grams of methamphetamine was to be delivered to him, he did not expect 14 kilos. Further, Mr. Moreno did not have any idea about the purity of the drugs. The deliveries of drugs to Mr. Moreno were directed by other unindicted conspirators including his incarcerated brother.

### D. Sentencing Guideline Range and Policy Statements (18 U.S.C. § 3553(a)(4), (5))

#### 1. The arbitrary and capricious guideline-created disparity between mixed and actual methamphetamine produces an advisory guideline range that this Court should categorically reject. (18 U.S.C. § 3553(a)(4), (5))

The Presentence Investigation Report ("PSR") concludes that, based on the base offense level corresponding to "actual" instead of "mixed" methamphetamine, Mr. Moreno has a total offense level of 33 and a criminal history category of I, yielding a guideline range of 135 to 168 months of imprisonment. This range recommends a sentence that is arbitrarily longer than necessary in general and as applied to Mr. Moreno in particular.

Mr. Moreno pled guilty to conspiring to distribute 500 grams or more of a mixture or

4

substance containing a detectable amount of methamphetamine and attempting to possess with intent to distribute 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine. See Information (ECF No. 1). Mr. Moreno was not charged with, and did not plead guilty to, conspiring to or attempting to possess with intent to distribute actual methamphetamine or "Ice" (methamphetamine that is at least 80% pure). Nonetheless, in the Presentence Report, the probation officer assigned Mr. Moreno a base offense level of 38, which corresponds to the Drug Quantity Table's offense level for actual or pure meth. Mr. Moreno's base offense level in the Drug Quantity Table for a mixture containing methamphetamine is only 34.[2] The sentencing guidelines manual establishes a 10:1 ratio in its treatment of quantities of methamphetamine mixture and actual methamphetamine or ice. This Court should categorically reject, on policy grounds, this disparity in treatment of actual methamphetamine and methamphetamine mixture in the guidelines. In doing so, this Court will join a growing number of district courts that have declared a policy disagreement with the purity-driven methamphetamine guidelines. See *United States v. Rodriguez,* No. 3:17-CR-31-TMB, 2019 WL 1508036, at *3 (D. AK April 5, 2019) (Burgess, J.); *United States v. Bean,* 371 F.Supp. 3d 46 (D. N.H. Mar. 1, 2019); *United States v. Pereda,* 1:18-CR-228-CMA, 2019 WL 463027, at *4 (D. Col. Feb. 6, 2019); *United States v. Requena,* 4:18-CR-175-BLW, 2019 WL 177932, at *2 (D. Idaho Jan. 11, 2019); *United States v. Hoover,* No. 4:17-CR-327-BLW, 2018 WL 5924500, at *4 (D. Idaho Nov. 13, 2018); *United States v. Ferguson,* No. 17-204, 2018 WL 3682509, at *3 (D. Minn. Aug. 2, 2018) (Tunheim, C.J.); *United States v. Saldana,* No. 1:17-CR-271-1, 2018 U.S. Dist. LEXIS 110790, at *7-10 (W.D. Mich. July 3, 2018); *United States v. Harry,* 313 F.Supp. 3d 969, 974 (N.D. Iowa 2018) (Strand, C.J.); *United States v.*

---

[2] With a base offense level of 34 and credit for acceptance of responsibility (-3) and safety valve (-2), the total offense level is 29 and results in an advisory range of 87-108 months. With an additional two level reduction for minor role, the range is reduced to 63-78 months.

*Nawanna,* 321 F.Supp. 3d 943, 945 (N.D. Iowa 2018) (Bennett, J.); *United States v. Ibarra-Sandoval,* 265 F. Supp. 3d 1249, 1252-54 (D. N.M. 2017) (Brack, J.); *United States v. Jennings,* 4:16-CR-48-BLW, 2017 WL 2609038 at *2-4 (D. Idaho June 15, 2017) (Winmill, C.J.); *United States v. Ortega,* 8:09-CR-400, 2010 WL 1994870, at *407 (D. Neb. May 17, 2010) (Bataillon, C.J.).

The collective reasoning of these courts persuasively shows that the methamphetamine guidelines are fatally flawed for the following reasons: (1) there is no empirical basis for the Sentencing Commission's harsher treatment of offenses involving higher purity methamphetamine; (2) methamphetamine purity is not a reliable proxy for criminal culpability; and (3) the methamphetamine guidelines create unwarranted sentencing disparities between methamphetamine offenses and between offenses involving other drugs.

    a. **The history of the methamphetamine guidelines**

The current Sentencing Guidelines establish base offense levels for methamphetamine offenses based on the drug's purity: methamphetamine, methamphetamine (actual), and "Ice." See U.S.S.G. § 2D1.1(c), Notes to Drug Quantity Table (B)-(C). "Methamphetamine" refers to the gross weight of a mixture containing a detectable amount of methamphetamine (hereinafter referred to as "methamphetamine mixture"). See *id.* at Notes to Drug Quantity Table (A). "Methamphetamine (actual)" refers to the weight of actual methamphetamine contained in the mixture. See *id.* at (B). "Ice" means the weight of a methamphetamine mixture of at least 80% purity. See *id.* at (C). The guidelines direct the court to determine the base offense level using either the offense level for the entire weight of the mixture or substance or the offense level for the methamphetamine (actual), whichever is higher. *Id.* at (B). The current base offense levels depend on the purity of the drug involved and use a 10:1 ratio to distinguish between pure, or "actual," methamphetamine and an equivalent total weight of a mixture containing methamphetamine.

The Guidelines did not always distinguish between actual methamphetamine and a meth

mixture.  In *Hayes,* Judge Bennett of the Northern District of Iowa examined and outlined the creation of the methamphetamine Guidelines in great detail.  948 F. Supp. 2d at 1017-1021.  A copy of the *Hayes* opinion is attached as Exhibit 2, and the court's historical summary of the Guidelines is incorporated by reference.

In summary, Congress created the United States Sentencing Commission (the "Commission") and tasked it with establishing sentencing policies that meet the several purposes of sentencing set forth in 18 U.S.C. § 3553(a)(2).   *Hayes*, 948 F. Supp. 2d at 1018. "In meeting its mandate the Commission faced philosophical conflict among its members, including conflict between members who emphasized moral culpability and 'just punishment,' and those who stressed the need for 'crime control.'" *Ibarra-Sandoval*, 265 F. Supp. 3d at 1252 (citing *Rita*, 551 U.S. at 351). Rather than pick a side, the Commission compromised with an empirical approach: it examined 10,000 presentence reports showing how judges had handled sentencing in the past, and then the Commission modified past practice "in the interest of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like." *Id.*

However, the Commission's ordinary empirical process was not used to set the Guideline ranges for drug offenses. *Gall*, 552 U.S. at 46 n.2. Instead, Congress "hastily enacted" the Anti-Drug Abuse Act of 1986 ("ADAA") in response to the death of basketball star Len Bias. *Ibarra-Sandoval*, 265 F. Supp. 3d at 1253. The ADAA established a two-tiered system of mandatory minimum sentences for drug offenses depending on the drug type and quantity. *Id.* This two-tiered system was designed to punish certain categories of drug traffickers, such as kingpins and organizers.

> For the kingpins—the masterminds who are really running these operations—and they can be identified by the amount of drugs with which they are involved—we require a jail term upon conviction. If it is their first conviction, the minimum terms is 10 years . . . Our proposal would also provide mandatory minimum penalties to the middle-level dealers as well. Those criminals would also have to serve time in jail. The minimum sentences would be slightly less than those for the kingpins, but they nevertheless would have to go to jail—a minimum of 5 years in the first instance.

7

U.S. Sentencing Comm'n, Special Report of Congress: Cocaine and Federal Sentencing Policy 119 (Feb. 1995) (citing 132 Cong. Rec. S. 14,300 (Sept. 30, 1986) (statement of Senate Minority Leader Robert Byrd). "By using drug type and quantity as a proxy for criminal role, Congress opened the door for low-level drug offenders who happened to have a certain drug type or quantity to suffer punishments intended for kingpins and organizers." *Ibarra-Sandoval*, 265 F. Supp. 3d at 1253 (citing *United States v. Diaz*, 2013 U.S. Dist. LEXIS 11386, at *5 (E.D.N.Y. Jan. 28, 2013)). After the enactment of the ADAA, the Commission decided not to apply its usual empirical approach to determine appropriate Guidelines sentences for drug offenses. *Id.* "Instead, the Commission simply keyed the Guidelines range to the statutory mandatory minimum sentences." *Id.* "Consequently, the drug-offense Guidelines are not a reflection of the Commission's institutional strengths, and a district court has more discretion to vary from the drug offense Guidelines based on policy disagreements than in a case where the applicable guidelines were promulgated pursuant to the Commission's usual empirical approach." *Id.*

Currently, Base Offense Levels for federal drug crimes are calculated using the Drug Quantity Table in § 2D1.1(c) of the Guidelines, which uses a graduated scale based on the type and quantity of drugs involved. Methamphetamine, unlike most controlled substances, is quantified based on purity, using either the weight of a mixture containing the drug or the weight of the pure drug itself contained within the mixture, whichever yields the greater offense level. See U.S.S.G. § 2D1.1, Notes to Drug Quantity Table (B) (see table below). There is a 10:1 ratio between pure methamphetamine and an equivalent weight of methamphetamine mixture.

| Offense Level | Weight (pure) | Weight (mix) |
|---|---|---|
| 12 | Less than 500mg | Less than 5g |
| 14 | At least 500mg but less than 1g | At least 5g but less than 10g |
| 16 | At least 1g but less than 2g | At least 10g but less than 20g |
| 18 | At least 2g but less than 3g | At least 20g but less than 30g |
| 20 | At least 3g but less than 4g | At least 30g but less than 40g |
| 22 | At least 4g but less than 5g | At least 40g but less than 50g |
| 24 | At least 5g but less than 20g | At least 50g but less than 200g |
| 26 | At least 20g but less than 35g | At least 200g but less than 350g |
| 28 | At least 35g but less than 50g | At least 350g but less than 500g |
| 30 | At least 50g but less than 150g | At least 500g but less than 1.5kg |
| 32 | At least 150g but less than 500g | At least 1.5kg but less than 5kg |
| 34 | At least 500g but less than 1.5kg | At least 5kg but less than 15kg |
| 36 | At least 1.5kg but less than 4.5kg | At least 15kg but less than 45kg |
| 38 | 4.5kg or more | 45kg or more |

Under the 10:1 ratio, a defendant sentenced under the methamphetamine mixture Guidelines with a quantity of between 500g and 1.5kg—assuming criminal history category III and no adjustments—is subject to a base offense level of 30 with an advisory Guidelines range of 121–151 months. That same defendant under the pure methamphetamine Guidelines is subject to an increased base offense level of 34 with an advisory Guidelines range of 168–210—resulting in a four- to five-year increase in the term of imprisonment.

      b.  **There is no empirical basis for the disparity in treatment based on methamphetamine purity.**

Whether a Court may draw any useful advice from a guideline depends first on whether the Sentencing Commission, in promulgating or amending the guideline, acted in "the exercise of its characteristic institutional role." *Kimbrough*, 552 U.S. at 109. As described in *Rita v. United States*, 551 U.S. 338, 348-50 (2007) the exercise of this role has two basic components: (1) reliance on empirical evidence of pre-guidelines sentencing practice, and (2) review and revision in light of judicial decisions, sentencing data, and consultation with participants in and experts on the criminal justice system. Where a guideline was not developed based on this "empirical data and national experience," it is not an abuse of discretion to conclude that it "yields a sentence 'greater than

necessary' to achieve § 3553(a)'s purposes, even in a mine-run case." *Kimbrough*, 552 U.S. at 109-10.

As noted above, when the Commission established its 10:1 ratio for methamphetamine, similar to formulating the crack-powder cocaine disparity, it "abandoned its institutional role and reliance on any empirical data in promulgating those Guidelines and had, instead, promulgated the Guidelines based on statutory directives." *Nawanna*, 321 F.Supp.3d at 949; *United States v. Hartle,* 2017 U.S. Dist. LEXIS 93367, at *2 (D. Idaho, June 15, 2017) ("Rather, these [purity] distinctions seem to be tiered to a similar 10:1 ratio used in mandatory minimum sentences imposed by Congress."). Of note, when the 1988 Anti-Drug Abuse Act introduced the purity distinctions establishing the weight for each mandatory minimum, "the Commission responded by amending the Guidelines to reflect the 10-1 mixture/pure substance ratio." *Hartle,* 2017 U.S. Dist. LEXIS 93367, at *2. "No empirical data from the Sentencing Commission or in the academic literature appears to justify this ratio." *Saldana,* 2018 U.S. Dist. LEXIS 110790, at *4.

As a result, the 10:1 ratio is "by its very nature, a product of political calculation and compromise rather than empirical analysis." *Id.* And because the Commission failed to root the Guideline in empirical data or national experience, it is not entitled to any deference from sentencing courts. *Saldana,* 2018 U.S. Dist. LEXIS 110790, at *6-7

### c. Methamphetamine purity is not a reliable proxy for criminal culpability.

The guidelines' justification for higher base offense levels for higher purity drugs is based on the flawed premise that purity "is probative of the defendant's role or position in the chain of distribution." U.S.S.G. § 2D1.1, comment 27(C); *see also United States v. Saldana,* 1:17-cr-271-1, 2018 U.S. Dist. LEXIS 110790 at *8 (W.D. Mich. July 3, 2018). The Commission explains in the commentary that "[s]ince controlled substances are often diluted and combined with other substances as they pass down the chain of distribution, the fact that a defendant is in possession of unusually pure narcotics may indicate a prominent role in the criminal enterprise and proximity to

the source of the drugs." *Id.* This rationale provides the basis for the guidelines' consideration of purity in setting base offense levels for some drugs, like methamphetamine. *See id.; see also United States v. Ibarra-Sandoval*, 265 F.Supp.3d 1249, 1255 (D. N.M. 2017) (acknowledging that comment 27(C) explains the rationale for purity-based methamphetamine guidelines); *United States v. Nawanna,* 321 F.Supp. 3d 943, 951 (N.D. IA 2018); *United States v. Saldana*, 2018 U.S.110790. For other drugs, like heroin, where purity is not considered in setting the base offense level, this rationale justifies an upward departure based on purity. *See* U.S.S.G. § 2D1.1, comment 27(C).

This is assumption that purity indicates a defendant is close to the source of drugs and therefore played a leadership role in the conspiracy is disconnected from current market realities. In its 2018 National Drug Threat Assessment, the Drug Enforcement Administration found that the average purity of methamphetamine between 2012 and 2017 was over 90%. *See* Drug Enforcement Administration, *2018 National Drug Threat Assessment* (October 2018) at 72, available at[https://www.dea.gov/sites/default/files/2018-11/DIR-032-18%202018%20NDTA%20final%20low%20resolution.pdf](https://www.dea.gov/sites/default/files/2018-11/DIR-032-18%202018%20NDTA%20final%20low%20resolution.pdf). Further, methamphetamine sampled through the DEA Methamphetamine Profiling Program (MPP) in the second half of 2017 averaged 96.9 percent purity (See Table on next page), and an analysis of domestic methamphetamine purchases from January 2012 through March 2017 indicates the purity of meth increased six percent – from 87.9 percent to 93.2 percent. *Id.*



Average methamphetamine purity has not always been this high. Between the 1980s and 2007, the average purity of methamphetamine fluctuated between approximately 30% and 80%. *See* Attached Exhibit 3 at 16. (Fries, A, et al, *The Price and Purity of Illicit Drugs: 1981-2007,* Institute for Defense Analysis (October 2008)). Thus, at one time, the guidelines' more severe treatment of higher purity meth was more grounded in fact. *See Nawana*, 321 F.Supp. 3d at 951 (noting that there was once some truth to the assumption that higher purity indicates higher culpability). That assumption is no longer valid due to the consistently high average purity of methamphetamine.

Currently, the purity of meth does not necessarily reflect a defendant's role in the distribution chain. "Low-level street dealers are just as likely as so-called 'kingpins' to have access to, and be charged with distribution of, extremely pure methamphetamine. In effect, then, the purity-based methamphetamine guidelines are treating all defendants as kingpins, even though that is not necessarily true." *United States v. Bean,* 371 F.Supp.3d 46, 53 (D. N.H. 2019). *See also Saldana,* 2018 U.S. Dist. LEXIS 110790, at *9 (explaining that the guidelines "subject all defendants to harsh

12

treatment, regardless of a particular defendant's role and regardless of any scoring enhancement already accounting for a defendant's role in the offense"); *United States v. Ortega,* No. 8:09CR400, 2010 WL 1994870, at *7 (D. Neb. May 17, 2010) ("The [10:1] ratio illogically skews sentences for 'average' defendants to the upper end of the sentencing spectrum, blurring the distinctions between high and low level distributors in a hierarchy.").

This harsher treatment of almost all defendants based on one factor – purity – obscures other factors and creates "false uniformity." *Bean*, 371 F.Supp.3d at 53 (citing *United States v. Cabrera,* 576 F. Supp. 2d 271, 273 (D. Mass. 2008) ("False uniformity occurs when we treat equally individuals who are not remotely equal because we permit a single consideration, like drug quantity, to mask other important factors."). Accordingly, this Court should conclude that purity of methamphetamine is no longer an accurate measure of culpability.

### d. The methamphetamine guidelines create unwarranted sentencing disparities.

Methamphetamine offenders receive more severe sentences than any other drug offenders. *See Nawanna,* 321 F. Supp. 3d at 953-54 (reviewing Sentencing Commission statistics regarding methamphetamine sentences.) The average length of incarceration for meth offenders in Fiscal Year 2017 was 91 months, higher than the average sentence for any other drug *including heroin*. See Attached Exhibit 4 (Chart produced using the U.S. Sentencing Commission's Interactive Sourcebook using the Commissions' fiscal year 2017 Datafile). This disparity is due to the fact that the guidelines provide higher base offense levels for actual meth than for comparable drugs.

The following chart demonstrates the difference in offense levels and subsequent guideline ranges for an offender convicted of distributing 500 grams of various drugs (assuming a 3-level reduction for acceptance of responsibility and Criminal History Category III.

| Drug (500 grams) | Base Offense Level | Guidelines Sentence Range |
|---|---|---|
| Actual Methamphetamine | 34 | 135 to 168 months |
| Methamphetamine Mixture | 30 | 87 to 108 months |
| Cocaine Base (Crack) | 30 | 87 to 108 months |
| Fentanyl | 30 | 87 to 108 months |
| Heroin | 26 | 57 to 71 months |
| Cocaine (Powder) | 24 | 46 to 57 months |

Actual methamphetamine is punished more severely than any other major drug. No empirical evidence supports this harsher treatment, and, accordingly, the guidelines create unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct, in violation of the mandate of 18 U.S.C. § 3553(a)(6).

Sentencing data from the United States Sentencing Commission reflects the fact that many Courts are finding the methamphetamine guidelines to be too high.[3] In recent years, the proportion of methamphetamine trafficking offenders sentenced within the guideline range has decreased substantially from 42% in fiscal year 2009 to 29.2% in fiscal year 2015.[4] Even factoring out defendants who received a below range sentence for substantial assistance and for participation in an early disposition program, the rate of non-government sponsored below guideline range sentences for methamphetamine traffickers has increased. In Fiscal Year 2017, only one third (30.1%) of all offenders sentenced for a methamphetamine offense received a within guideline sentence. The

---

[3] *See* Quick Facts: Methamphetamine Trafficking Offenses, from United States Sentencing Commission, 2011 through 2015 Datafiles, available at http://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Methamphetamine_FY15.pdf and Quick Facts: Methamphetamine Trafficking Offenses, United States Sentencing Commission, 2009 through 2013 Datafiles, available at http://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Quick_Facts_Methamphetamine_2013.pdf

[4] *Id.*

government sponsored below guideline range sentences in about half of all meth cases (46.7%).  *See* USSC, *Quick Facts:  Methamphetamine Trafficking Offenses,* available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Methamphetamine_FY17.pdf.  In addition, the rate of non-government sponsored below guideline sentences in meth cases was 22.6% in FY 17 and the average reduction for 33.8%.  *Id.*  Accordingly, in order to avoid an unwarranted disparity, a below-guideline sentence is appropriate here.

Of course, this Court does not need to find that the methamphetamine guidelines are too harsh for every single defendant to conclude that *in this case* Mr. Moreno should receive a sentence underneath his guideline range.  The evidence suggests that his drug distribution began in early 2018 and concluded a few months later when he was arrested on June 23, 2018.  Mr. Moreno was not running a complicated drug distribution enterprise.  Instead, he only distributed drugs to two individuals.  He had no other customers.  Further, he did not control how much of the drug he received, knew nothing about the source of the drugs, and did not have any clue about the purity of the drug.  Mr. Moreno's drug distribution activity is not representative of the criminal enterprise that the disparity between the pure and mixture of methamphetamine guidelines may be intended to penalize.

### 2.  Mr. Moreno is eligible for a minor role adjustment under U.S.S.G. § 3B1.2

Mr. Moreno is eligible for a two-level reduction under Section 3B1.2(b) because he is less culpable than most other participants in this criminal activity.  Section 3B1.2 was amended by the Sentencing Commission in November, 2015 to clarify that this adjustment should apply to a defendant who is substantially less culpable than the average participant and to further clarify that "the fact that a defendant performs an essential or indispensable role in the criminal activity is not determinative" of whether a defendant should receive a mitigating role adjustment.  *See* Amendment

15

794. The Sentencing Commission specifically cited similar cases from other circuits that denied a mitigating role adjustment because the defendant was "integral" or "indispensable" to the commission of the offense as a primary reason for its amendment to Section 3B1.2. Specifically, the Commission stated:

> A "finding that the defendant was essential to the offense does not alter the requirement, expressed in Note 3(A), that the court must assess the defendant's culpability relative to the average participant in the offense. Accordingly, the amendment revises the commentary to emphasize that 'the fact that a defendant performs an essential or indispensable role in the criminal activity is not determinative' and that such a defendant may receive a mitigating role adjustment, if he or she is otherwise eligible.

U.S.S.C. Supplement to App. C, Amendment 794. The following information shows that this adjustment is applicable in Mr. Moreno's case.

During his short-lived involvement in this offense, Mr. Moreno acted largely as a middleman. The commentary to Section 3B1.2 provides that the fact that the defendant performs an essential or indispensable role in the criminal activity is not determinative. It is therefore appropriate to give Mr. Moreno a two-level reduction for being a minor participant.

### E. A 36-months sentence addresses the other sentencing factors the Court is required to consider. (18 U.S.C. § 3553(a)(2)(A), (B))

Distribution of methamphetamine is a serious crime. Its trafficking must be punished. However, considering the facts of this offense, a sentence of 36 months is more than adequate to punish Mr. Moreno for his role in the offense. Mr. Moreno was involved in the distribution of methamphetamine primarily as a middleman and became involved only with the prompting and encouragement of his older, incarcerated brother. His involvement in the conspiracy itself was very short lived, lasting only a few months. A sentence of 36 months is a severe punishment for a young offender who has no prior criminal history. In fact, a longer sentence is likely to have a negative effect on Mr. Moreno because studies have shown that low risk offenders such as Mr. Moreno tend to be more negatively impacted by the prison experience. In particular, the study showed that there

was a tendency for the lower risk groups who were incarcerated with other higher risk offenders to show a greater increase in recidivism upon release. *See* Gendreau, Paul et al, *The Effects of Prison Sentences on Recidivism*, Department of Criminal Justice, University of Cincinnati (1999), available at: http:// citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.629.7703&rep=rep1&type=pdf. Thus, a sentence of 36 months is more than sufficient to address this sentencing factor.

Further, a sentence of 36 months is sufficient to deter Mr. Moreno as well as the general public from committing crimes. The Sentencing Commission has recognized that imposing a lengthy prison sentence on a low-level street dealer does little to protect the public or deter others from committing crimes:

> Unlike repeat violent offenders, whose incapacitation may protect the public from additional crimes by the offender, criminologists and law enforcement officials testifying before the Commission have noted that retail-level drug traffickers are readily replaced by new drug sellers so long as the demand for a drug remains high. Incapacitating a low-level drug seller prevents little, if any drug selling; the crime is simply committed by someone else.

U.S. Sentencing Commission, *Fifteen Years of Guidelines Sentencing*, at 134 (Nov. 2004) (available on the Sentencing Commission's website at http://www.ussc.gov/ research_and_Statistics/Research_Projects/Miscellaneous/15_Year_Study/chap4.pdf).

As noted by the Sentencing Commission, there is no evidence that increases in sentences do in fact deter crime. "Three National Academy of Science panels, all appointed by Republican presidents, reached that conclusion, as has every major survey of the evidence." Michael Tonry, *Purposes and Functions of Sentencing,* 34 Crime and Justice: A Review of Research 28-29 (2006). Instead, research has generally shown that "increases in the *certainty* of punishment, as opposed to the *severity* of punishment, are more likely to produce deterrent benefits." *See* Valerie Wright, *Deterrence in Criminal Justice: Evaluating Certainty vs. Severity of Punishment*, The Sentencing Project (Nov. 2010) at 1 (hereinafter "Deterrence Study"), *available at* http://www.sentencingproject.org/wp-content/uploads/2016/01/Deterrence-in-Criminal-Justice.pdf, (noting a study that found that

17

longer prison sentences achieved only a three percent reduction in recidivism). The Department of Justice acknowledges the facts that the certainty of being caught is a vastly more powerful deterrent to crime and that the severity of punishment is an ineffective deterrent to crime. *See* National Institute of Justice, *Five Things About Deterrence*, (June 6, 2016) available at: https://nij.gov/five-things/pages/deterrence.aspx . Therefore, the fact that Mr. Moreno is being sentenced at all will achieve the same amount of general deterrence, regardless of the length of his sentence.

### E.     Rehabilitation (18 U.S.C. § 3553(a)(2)(D))

18 U.S.C. § 3553(a)(2)(D) requires the court to consider the need for the sentence to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. However, imprisonment is "not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582(a). Clearly, given his youth, Mr. Moreno would benefit from participation in vocational training while in prison. Mr. Moreno is specifically interested in vocational training in the areas of welding and computer aided drafting (CAD). According to the most recent edition of the *Federal Prison Guidebook*, vocational training in both of these areas is offered at FCI Morgantown, and Mr. Moreno accordingly requests that the Court recommend that he serve any sentence at FCI Morgantown so he has the opportunity to participate in these vocational training programs.

## CONCLUSION

This is Mr. Moreno's first offense of significance. He is a young man who lost his mother when he was a young teenager and had no father figure in his life. His older brother encouraged and instigated his vulnerable and naïve younger brother's participation in the offense from within his prison walls. Mr. Moreno will be separated from his family for whatever period of incarceration this Court imposes and faces all the collateral consequences of a felony conviction.

With respect to the guidelines, this Court should find that Mr. Moreno is eligible for a two-

level safety valve reduction and that he is eligible for a two-level role reduction in light of the fact that he is clearly less culpable than the other unindicted participants in his offense. Further, in light of the disproportionate weight these guideline calculations give to the purity of the methamphetamine in this case, this Court should disregard or at least significantly discount the helpfulness of the guidelines in determining an appropriate sentence. Mr. Moreno is clearly not the major drug trafficker that the drug guidelines contemplated by base offense level 38. Given these facts, it is appropriate for the court to consider a sentence substantially below the guideline range produced by the methamphetamine guidelines in this case.

In light of Mr. Moreno's youth, difficult childhood after his mother's tragic passing, the influence of his older brother in his involvement in the offense, and the draconian nature of the sentencing guidelines in this case, this Court should sentence Mr. Moreno to no more than 36 months in custody.

Respectfully submitted,

MIGUEL MORENO
By Counsel

Counsel:

s/Andrea Harris
Andrea Harris (VSB No. 37764)
Assistant Federal Public Defender
Office of the Federal Public Defender
401 E. Market St, Suite 106
Charlottesville, VA 22902
Tel (434) 220-3380

## CERTIFICATE OF SERVICE

I hereby certify that on July 17, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following: counsel of record; and I hereby certify that I have mailed by United States Postal Service

19

the document to the following non-CM/ECF participants: none.

                                                                      s/Andrea Harris  
                                                                       Asst. Federal Public Defender