IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Criminal Action No. 5:19CR002 |
| v. | ) |
| | ) |
| MIGUEL ANGEL MORENO, | ) By: Michael F. Urbanski |
| | ) Chief United States District Judge |
| Defendant. | ) |

## MEMORANDUM OPINION

Defendant Miguel Angel Moreno was prosecuted for conspiracy to distribute and attempted possession with the intent to distribute methamphetamine resulting from his receipt of a spare tire he knew contained controlled substances.[1] Far from a drug "kingpin," Moreno, a 22 year old United States citizen with no criminal history other than driving offenses, qualified for the safety valve under United States Sentencing Guidelines ("U.S.S.G.") § 5C1.2. Nonetheless, based solely on the quantity and purity of the methamphetamine found in the spare tire, Moreno faced a Guideline sentence range of 135-168 months.

At sentencing, the court articulated its reasons for a downward variance to 36 months, believing that sentence to be "sufficient, but not greater than necessary" to comply with the purposes set forth in 18 U.S.C. § 3553(a)(2). The reasons for the downward variance included Moreno's adverse childhood circumstances stemming from the abandonment by his father and his mother's tragic death when he was 13. In his teens, Moreno fell under the influence of his brother,

---

[1] The spare tire was located on a Jeep being shipped cross-country. Moreno took possession of the Jeep in Waynesboro, Virginia, on June 23, 2018. While the Jeep was being hauled from California to Virginia, authorities located and removed over 14 kilograms of high purity methamphetamine from the tire and replaced it with an uncut tire. After he removed the spare tire from the Jeep and was confronted by authorities, Moreno admitted that he was receiving telephone directions from his brother, incarcerated in the Bureau of Prisons for methamphetamine distribution, to pick up the tire. Statement of Facts, ECF No. 8, ¶¶ 1-6; Presentence Investigation Report, ECF No. 22, at ¶¶ 5-9.

an incarcerated felon, who arranged from prison to have methamphetamine shipped to Moreno. According to Moreno's sentencing memorandum,

> He was directed where and when to pick up the drugs, who and how much to pay for them, and did not have a sophisticated understanding of who was involved in the offense. Miguel was involved in the drug distribution activities for no more than six months. It is clear that but for his brother's directions and persuasion, Mr. Moreno would not have been involved in drug dealing at all.

Miguel Moreno's Sentencing Memorandum, ECF No. 26, at 3-4. The government disagreed, contending that Moreno had a more substantial retail role. United States' Sentencing Memorandum, ECF No. 28, at 3. Moreno has had a stable work history, and when faced with these charges, self reported and performed well on bond prior to sentencing. There was no suggestion of violence or involvement of firearms in Moreno's conduct.

As explained below, the court also varied downwards based on a categorical policy disagreement with the methamphetamine Guidelines. This memorandum opinion details the court's reasons for the policy disagreement.

I.

In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court instructed district courts to read the Sentencing Guidelines as effectively advisory, serving as "one factor among several courts must consider in determining an appropriate sentence." Kimbrough v. United States, 552 U.S. 85, 90 (2007). While "the Guidelines should be the starting point and initial benchmark" of the sentencing process, and must be considered as a factor in sentencing, they "are not the only consideration." Gall v. United States, 552 U.S. 38, 49 (2005). After calculating the Guidelines range and allowing argument, "the district court should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, he may not presume that the Guidelines range is reasonable. He must make an individualized assessment based on the

facts presented." Id. at 49-50. In Spears v. United States, 555 U.S. 261, 265-66 (2009), the Supreme

Court clarified its holding in Kimbrough, holding that "district courts are entitled to reject and vary

categorically from the . . . Guidelines based upon a policy disagreement with those Guidelines."

Although the Sentencing Guidelines are now advisory, the Supreme Court has "nevertheless

preserved a key role for the Sentencing Commission." Kimbrough, 552 U.S. at 108. "Congress

established the Commission to formulate and constantly refine national sentencing standards." Id.

"[T]he sentencing statutes envision both the sentencing judge and the Commission as carrying out

the same basic § 3553(a) objectives, the one, at retail, the other at wholesale." Rita v. United States,

551 U.S. 338, 348 (2007). "Carrying out its charge, the Commission fills an important institutional

role: It has the capacity courts lack to 'base its determinations on empirical data and national

experience, guided by a professional staff with appropriate expertise.' United States v. Pruitt, 502 F.

3d 1154, 1171 (10th Cir. 2007) (McConnell, J., concurring)." Kimbrough, 552 U.S. at 108-09.

## II.

The Drug Quantity Table found in § 2D1.1(c) of the Guidelines is the starting point for

calculating the base offense level for drug crimes under the United States Sentencing Guidelines

("U.S.S.G."). For most drug offenses, the base offense level reflects the type and quantity of drug(s)

involved. Unlike other controlled substances, the Guidelines distinguish between three

concentrations of methamphetamine, resulting in a 10:1 ratio between actual methamphetamine and

methamphetamine mixture.[2] For example, the highest base offense level, Level 38, applicable here,

applies to 45 kilograms or more of methamphetamine mixture, but this offense level only requires

---

[2] The Guidelines quantify "methamphetamine" as "refer[ring] to the entire weight of any mixture or substance containing a detectable amount of the controlled substance." USSG § 2D1.1, n.(A). "Methamphetamine (actual)" "refer[s] to the weight of the controlled substance, itself, contained in the mixture or substance." Id. at n.(B). "Ice" "means a mixture or substance containing d-methamphetamine hydrochloride of at least 80% purity." Id. at n.(C). Actual methamphetamine and ice are treated the same for Guidelines purposes and are assigned a base offense level ten times the amount of methamphetamine mixture. "In this way, the ratio imposed by the methamphetamine guidelines is different from the 100:1 crack-cocaine ratio at issue in [United States v.] Kimbrough[, 552 U.S. 85 (2007)]."

4.5 kilograms of actual methamphetamine or ice.[3] "The practical effect of the ratio is to impose a presumed purity of 10% for untested methamphetamine mixtures." United States v. Hoover, No. 4:170cr-327-BLW, 2018 WL 5924500, at *2 (D. Idaho November 13, 2019).

The methamphetamine Guidelines are not empirically based, but rather derive the 10:1 purity ratio from the mandatory minimum penalties contained in 21 U.S.C. § 841(b)(1)(A) and 841(b)(1)(B). In 1988, Congress set mandatory minimum sentences for methamphetamine offenses. Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690, § 6470(g)-(h), 102 Stat. 4181, 4378 (codified at 21 U.S.C. § 841(b)(1). "The following year, in 1989, the United States Sentencing Commission revised the Drug Quantity Table in § 2D1.1 by incorporating the statutory penalties and by differentiating between actual/pure methamphetamine and methamphetamine mixtures at the same 10-to-1 ratio." United States v. Ferguson, No. CR 17-204 (JRT/BRT), 2018 WL 3682509, at *2 (D. Minn. Aug. 2, 2018). After Congress reduced the quantities of methamphetamine needed to meet the mandatory minimum sentences in 1998, the Sentencing Commission followed suit and increased the base offense levels for methamphetamine offenses. "To summarize, the commission twice amended the Guidelines for methamphetamine offenses so that the base offense levels (for a defendant with a criminal history category of I) would exactly align with the mandatory-minimum sentences — and the Commission did so each time right after Congress created or changed the minimum sentences." Id. "Consequently, the drug offense Guidelines are not a reflection of the Commission's institutional strengths, and a district court has more discretion to vary from the drug offense Guidelines based on policy disagreements than in a case where the applicable guidelines were promulgated pursuant to the Commission's usual empirical approach." United States v. Ibarra-Sandoval, 265 F. Supp. 3d 1249, 1253 (D. N.M. 2017) (citing Kimbrough, 552 U.S. at 89).

---

[3] Because actual methamphetamine and ice are assigned the same guideline level, this opinion collectively refers them as actual methamphetamine.

## III.

As recognized by an emerging chorus of district courts around the country,[4] one problem with the Sentencing Commission's promulgation of the methamphetamine Guidelines is that "the Sentencing Commission deviated from the empirical approach when setting the Guideline ranges for drug offenses. Rather, the Commission chose to instead key the Guidelines to the statutory mandatory minimum sentences that Congress established for those crimes." Pereda, 2019 WL 463027, at *3 (D. Colo. Feb 6, 2019) (citing Gall, 552 U.S. at 46 n.2, and United States v. Diaz, No. 11-821, 2013 WL 322243, at *3-6 (E.D.N.Y. Jan. 28, 2013)). "This creates Guideline ranges for actual (and ice) methamphetamine that are excessive and not similar to other Guidelines, which are intended to be representative of a 'heartland' or 'a set of typical cases embodying the conduct that each guideline describes.'" Pereda, 2019 WL 463027, at *4 (citing Harry, 313 F. Supp. 3d at 972; Diaz, 2013 WL 322243, at *8 (quoting U.S.S.G. Manual § 1A4.13 (1987)).

A second problem with the methamphetamine guidelines is that methamphetamine purity is no longer an accurate indicator of a defendant's role in a drug trafficking conspiracy. "The average purity of all methamphetamine in the United States is greater than 90% — and has been since 2011 — according to the DEA." Pereda, 2019 WL 463027, at *4 (citing U.S. Dep't. of Justice, Drug Enforcement Admin., 2017 National Drug Threat Assessment 67-70 (2017), https://www.dea.gov/sites/default/files/2018-07/DIR-040-17 2017-NDTA.pdf; see also Ferguson, 2018 WL 3682509, at *4; Harry, 313 F. Supp. 3d at 972; Nawanna, 321 F. Supp. 3d at

---

[4] See United States v. Ortega, No. 09-400, 2010 WL 1994870 (D. Neb. May 17, 2010); United States v. Hayes, 948 F. Supp. 2d 1009 (N.D. Iowa 2013) (Bennett, J.); United States v. Jennings, No. 4:16-CR-48-BLW, 2017 WL 2609038 (D. Idaho June 15, 2017); United States v. Ibarra-Sandoval, 265 F.Supp.3d 1249, 1256 (D.N.M. 2017); United States v. Nawanna, 321 F.Supp.3d 943, 955 (N.D. Iowa 2018) (Bennett, J.); United States v. Harry, 313 F.Supp.3d 969, 974 (N.D. Iowa 2018) (Strand, J.); United States v. Saldana, No. 1:17-cr-271-1, 2018 U.S. Dist. LEXIS 110790, at *7-10 (W.D. Mich. July 3, 2018); United States v. Ferguson, No. CR 17-204 (JRT/BRT), 2018 WL 3682509, at *3-4 (D. Minn. Aug. 2, 2018); United States v. Hoover, No. 4:17-CR-327-BLW, 2018 WL 5924500, at *4 (D. Idaho Nov. 13, 2018); United States v. Requena, No. 4:18-CR-175-BLW, 2019 WL 177932 (D. Idaho Jan. 11, 2019); United States v. Pereda, No. 18-cr-00228-CMA, 2019 WL 463027 (D. Colo. Feb. 6, 2019); United States v. Bean, 371 F. Supp. 3d 46 (D. N.H. 2019); United States v. Rodriguez, 382 F. Supp. 3d 892 (D. Alaska 2019).

951-52; <u>Ibarra-Sandoval</u>, 265 F. Supp. 3d at 1253; <u>Jennings</u>, 2017 WL 2609038, at *3; <u>Ortega</u>, 2010 WL 1994870, at *7.) The purity of methamphetamine has risen over time.

> Average methamphetamine purity has not always been this high. Between the 1980s and 2007, the average purity of methamphetamine fluctuated between approximately 30% and 80%. . . . Consequently, at one time, the guidelines' harsher treatment of higher purity methamphetamine was more grounded in fact. <u>See Nawanna</u>, 321 F. Supp. 3d at 951 (noting that there was once some truth to the assumption that high purity indicates greater culpability). Now however, that is no longer the case due to the consistently high average purity of methamphetamine.

<u>Bean</u>, 371 F. Supp. 3d at 52. As a result, punishment meted out based on drug quantity and purity alone runs the real risk of overstating the culpability of offenders playing lesser roles in the methamphetamine distribution, and "can lead to perverse sentencing outcomes," <u>Nawanna</u>, 321 F. Supp. 3d at 952. <u>See Ferguson</u> 2018 WL 3682509, at *4; <u>Harry</u>, 313 F. Supp. 3d at 972-75; <u>Ibarra-Sandoval</u>, 265 F. Supp. 3d at 1253; <u>Jennings</u>, 2017 WL 2609038, at *3; <u>Ortega</u>, 2010 WL 1994870, at *7. As one court noted, "the Commission's assumption regarding the connection between methamphetamine purity and criminal role is divorced from reality. . . . [T]he average purity of methamphetamine today is over 90 percent. This means that the sentencing Guidelines would treat the average individual convicted of a crime involving methamphetamine as a kingpin or leader, even though that simply is not true." <u>Ibarra-Sandoval</u>, 625 F. Supp. 3d at 1255-56.[5]

Third, because the determination of purity can only be ascertained after laboratory testing, "the prevalence of high-purity methamphetamine virtually guarantees that a defendant's base offense level under the Guidelines will substantially increase if the methamphetamine is tested for purity — a decision that can be purely arbitrary." <u>Ferguson</u>, 2018 WL 3682509, at *4 (citing <u>Nawanna</u>, 2018 WL 2021350, at *3; <u>Jennings</u>, 2017 WL 2609038, at *4; <u>Ortega</u>, 2010 WL 1994870, at *4-7.) As the court

---

[5] Perhaps reflective of this reality, the <u>2018 Sourcebook of Federal Sentencing Statistics</u> reports that during fiscal year 2018, only 28.9% of methamphetamine drug trafficking offenders received "Within Guideline Range" sentences, fewer than any other major drug category. United States Sentencing Commission, <u>2018 Sourcebook of Federal Sentencing Statistics</u>, Table D-14.

noted in Ibarra-Sandoval, "[t]his problem is exacerbated by the fact that purity testing, which will on average reveal a purity level that leads to a harsher sentence, occurs capriciously." 265 F. Supp. 3d at 1257.

Finally, courts have questioned the severity of the methamphetamine Guidelines in comparison to other dangerous drugs, including heroin. In Harry, the court posed a hypothetical comparing the Guidelines range for a defendant facing a charge of conspiracy to distribute 500 grams of heroin versus 500 grams of 95% pure methamphetamine. All else being equal, the court calculated that the Guidelines range for methamphetamine offenses is "more than twice the range of the heroin conspirator. Why? Is ice methamphetamine more than twice as potent, dangerous, destructive or addictive than heroin? I am aware of no objective evidence — from the United States Sentencing Commission or otherwise — supporting such a proposition." Harry, 313 F. Supp. 3d at 973.

Earlier this year, the District of New Hampshire summarized the reasoning in these decisions as follows:

> This court finds the collective reasoning employed in these decisions persuasive and joins them by declaring a categorical policy disagreement with the methamphetamine guidelines for the following reasons: (1) there appears to be no empirical basis for the Sentencing Commission's harsher treatment of offenses involving higher purity methamphetamine; (2) methamphetamine purity is no longer an accurate indicator of a defendant's role in a drug-trafficking conspiracy; and (3) the methamphetamine guidelines create unwarranted sentencing disparities between methamphetamine offenses and offenses involving other major drugs.

Bean, 371 F. Supp. 3d at 51. The court agrees with the rationale set forth in these cases.

## IV.

Going forward, the court will employ the following process in arriving at a sentence in cases involving the actual (and ice) methamphetamine Guidelines. First, the court will calculate the advisory Guidelines range for actual methamphetamine. Second, the court will calculate an

alternative advisory Guidelines range using the base offense level for the same quantity of methamphetamine mixture. Third, the court will evaluate whether any upward or downward variances are appropriate and determine the appropriate sentence based on the § 3553(a) factors. Based on an individualized assessment of these factors, the resulting sentence could fall above, below or in the alternative advisory Guidelines range. As the Idaho district court outlined in Hoover, 2018 WL 5924500, at *4,

> The process will involve calculating both guideline ranges and then determining, based upon all of the circumstances, what constitutes a reasonable sentence under the facts of the case. Typically, this will result in a sentence much closer to the guideline range applicable if no testing had been completed. But, not always. There may be reasons why an individual defendant deserves a higher sentence, unrelated to drug purity. But that determination will be made in every case, based upon an individualized assessment of all the facts presented, without undue regard for the increased guideline range generated when drug purity is considered.

At the end of the day, regardless of what the alternative Guidelines range may be, the court will apply all of the relevant sentencing factors to arrive at a sentence that is "sufficient, but not greater than necessary" to meet the statutory purposes set forth in 18 U.S.C. § 3553(a)(2) in order to punish the defendant, deter him and others from future crimes, incapacitate the defendant to protect the public, and rehabilitate the defendant. United States v. Raby, 575 F.3d 376, 380 (4th Cir. 2009). As the court noted in Harry, such an approach "will hardly cause a windfall to defendants in methamphetamine cases. . . . [as] even the less-harsh methamphetamine mixture Guideline ranges are (a) higher than the ranges for similar quantities of heroin and cocaine and (b) generally equivalent to the ranges for similar quantities of fentanyl and crack cocaine." 313 F. Supp. 3d at 974.

## V.

In part because of the court's policy disagreement with the Guidelines' treatment of offenses involving actual/pure methamphetamine, the court granted Moreno's motion for a downward variance. Considering how the methamphetamine mixture Guidelines would have applied to

Moreno, along with all of the § 3553(a) factors, the court sentenced Moreno to 36 months imprisonment. The court found that Moreno's sentence was sufficient, but not greater than necessary, and would not result in any unwarranted sentencing disparities.

Judgment (ECF No. 33) has been entered accordingly.

Entered: August 5, 2019

/s/ Michael F. Urbanski

Michael F. Urbanski
Chief United States District Judge